ORIGINAL

*FILED IN CLERK'S OFFICE*
*U.S.D.C.-Atlanta*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MAY 8 - 2006

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

| | |
|---|---|
| BRIAN J. JENNER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BANK OF AMERICA | ) |
| CORPORATION, BANC OF | ) |
| AMERICA INVESTMENT | ) |
| SERVICES, INC., BANK OF | ) |
| AMERICA, NATIONAL | ) |
| ASSOCIATION, and MICHAEL | ) |
| DEGOLIAN, | ) |
| | ) |
| Defendants. | ) |

FILE NO:    **06 CV 1092**

JUDGE: **GET**

JURY TRIAL DEMANDED

## COMPLAINT

COMES NOW Plaintiff, Mr. Brian J. Jenner, who by and through counsel files

his Complaint for damages and equitable relief, showing the Court as follows:

## INTRODUCTION

1.

The instant action concerns the wrongful termination of Mr. Jenner from his position with Bank of America (as hereinafter defined) after less than five (5) months of employment.

2.

Mr. Jenner was unlawfully harassed during, and then suspended and dismissed from his position due to his age, which dismissal was the product of the discriminatory intent of the Defendants' managers and employees.  Indeed, Mr. Jenner has been the target of a concerted pattern of discriminatory and defamatory conduct instigated not only to illicitly deprive him of his position (for which he was more than qualified), but also of his ability to earn a living and compete for Bank customers following his discharge.

3.

As a direct result of Defendants' conduct, Mr. Jenner has been driven to the brink of bankruptcy and rendered unemployable in an industry in which he was once highly regarded and sought after for his talents and abilities.  He has suffered greatly in his professional stature and endured the emotional distress and mental anguish that

Defendants, their agents, officers, and employees inflicted upon him. The Defendants have breached their obligation to deal with Mr. Jenner fairly, in good faith, in comportment with the law, and for this and the other reasons related herein, Mr. Jenner seeks declaratory, injunctive, and equitable relief; liquidated, compensatory, general and punitive damages; and costs and attorney's fees.

## PARTIES

4.

Mr. Jenner is an individual and resident in the State of Georgia, Gwinnett County, at the property bearing the address 3940 Longlake Drive, Duluth, Georgia. He was fifty-eight (58) years of age at the time of his wrongful termination from and subsequent defamation by Bank of America and falls within the class of persons protected under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*, being over the age of forty (40).

5.

Bank of America Corporation, a Delaware corporation, is headquartered in Charlotte, North Carolina and registered to transact business in the State of Georgia. It can be served at C.T. Corporation System, Registered Agent, 1201 Peachtree Street, Northeast, Atlanta, Georgia 30361. Bank of America Corporation is a major employer

affecting interstate commerce and has, on information and belief, thousands of employees on its payroll. It is, consequently, subject to the provisions of 29 U.S.C. § 621 *et seq*.

6.

Bank of America, National Association, a national association, is headquartered in Charlotte, North Carolina and is a citizen of such state. *Wachovia Bank v. Schmidt*, 126 S.Ct. 941, 945 (2006). Bank of America, National Association, is a wholly owned subsidiary of Bank of America Corporation and serves as its central organizing corporate entity. It can be served at C.T. Corporation System, Registered Agent, 1201 Peachtree Street, Northeast, Atlanta, Georgia 30361, and at C.T. Corporation System, Registered Agent, 225 Hillsborough Street, Raleigh, North Carolina 27603. Bank of America, National Association, is a major employer affecting interstate commerce and has, on information and belief, thousands of employees on its payroll. It is, consequently, subject to the provisions of 29 U.S.C. § 621 *et seq*.

7.

Banc of America Investment Services, Inc., a Florida corporation, is headquartered in Boston, Massachusetts, and is a wholly owned subsidiary of Bank of America, National Association. It is registered to transact business in the State of

–4–

Georgia at can be served at C.T. Corporation System, Registered Agent, 1201 Peachtree Street, Northeast, Atlanta, Georgia 30361. Banc of America Investment Services, Inc. is a major employer affecting interstate commerce and has, on information and belief, thousands of employees on its payroll is a major employer having, on information and belief, thousands employees on its payroll. It is, consequently, subject to the provisions of 29 U.S.C. § 621 *et seq.* (Bank of America Corporation, Banc of America Investment Services, Inc., and Bank of America National Association, collectively hereinafter "**Bank of America**" or "**Bank**").

8.

Michael deGolian is an individual resident within this District and was Mr. Jenner's superior within the Bank. Mr. deGolian can be served at 3370 Woodhaven Road, N.W., Atlanta, Georgia 30305.

**JURISDICTION AND VENUE**

9.

Mr. Jenner seeks enforcement of a federal right pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* (hereinafter the

"**Act**"), the Fair Labor Standards Act, 29 U.S.C. § 216, and has certain additional claims under Georgia law.

10.

Jurisdiction over the federal claims is invoked, and questions of federal law predominate over those pertaining to matters of state law, pursuant to 28 U.S.C. §§ 1331, 1343 (a)(4), and 29 U.S.C. §§ 216 (b), 626 (c)(1).

11.

The Court retains jurisdiction over all other state law claims pled herein under the doctrine of ancillary jurisdiction, because they arise out of and substantially relate to the nexus of facts and events pertaining to Mr. Jenner's age discrimination claim, and otherwise relate to the jurisdiction vested in the Court pursuant to 28 U.S.C. § 1367.

12.

Jurisdiction over the federal claims is appropriate because Mr. Jenner has brought this Complaint within ninety (90) days of receiving a termination of interest and right to sue letter from the Equal Employment Opportunity Commission. Mr. Jenner also timely filed a complaint with the Equal Employment Opportunity Commission within one hundred eighty (180) days of the events giving rise to suit.

13.

Declaratory and injunctive relief is sought pursuant to 28 U.S.C. §§ 2001, 2002 and 29 U.S.C. §§ 216(b), 626(b).

14.

Venue properly lies before this Court pursuant to 28 U.S.C. § 1391 (b), because Defendants either, as applicable, reside or are registered to transact business in the State of Georgia and maintain a domicile or corporate office within the Northern District of Georgia, where a significant portion of the events giving rise to this action occurred, including the decision to terminate Mr. Jenner's employment and subsequently defame him.

### STATEMENT OF FACTS

15.

**I.    Mr. Jenner, as a Leading Figure in his Industry, was Hired by the Bank:** Mr. Jenner accepted an offer of employment with the Bank on March 24, 2005, to develop the Savannah, Georgia, market, with the title of Senior Vice President and position of Private Client Advisor.  In relying upon the offer of employment, he relocated his entire family from Cleveland, Ohio, to the State of Georgia.  He was

–7–

terminated a mere five (5) months later, on August 18, 2005, the same date his benefits and salary ceased.

16.

Prior to his employment with the Bank, Mr. Jenner was highly respected in his industry, having published numerous articles on wealth management strategies and challenges, in addition to being a popular speaker at corporate and other events. He was also frequently consulted by estate planning attorneys for his extensive knowledge of tax law and estate planning vehicles and was even invited to instruct Continuing Legal Education seminars.

17.

Mr. Jenner has worked in the banking industry for over a decade and, prior to being dismissed from the Bank, had never violated nor been charged with violation of any bank's policies, administrative rules or regulations, or applicable law.

18.

Mr. Jenner has, in addition, been employed in the financial services industry for over thirty (30) years, enjoyed a securities license for at least fourteen (14) of those years and has never had a regulatory issue or client complaint of any kind brought

against him.  In short, prior to his travails with the Bank, Mr. Jenner enjoyed a sterling

reputation and had earned the respect and esteem of his colleagues and clients.

19.

Mr. Jenner was hired for the Savannah market by Joseph Briner, who at the time

held the position of Senior Vice President in charge of the Georgia Region for the

Bank.  Mr. Briner and the Bank retained Mr. Jenner due to his extensive knowledge of

and cross-disciplinary approach to wealth management, centering upon his integration

of investments, trusts, and other wealth management devices for the successful

protection and enhancement of the assets of high net worth individuals.  The Bank also

desired his proven track record of establishing financially successful wealth

management operations within other banking institutions and of selling and promoting

financial products.

20.

In addition, Mr. Jenner held several Securities Licenses, including a Series 6, 7,

63 and 65, issued by the National Association of Securities Dealers (hereinafter

"**NASD**"), necessary for work in the securities industry.  In addition, he also held a

Life, Accident, and Health Insurance License and is a fellow of the Institute of Life and

Pension Advisors accredited by the Luyt Center for Business Law at the University of the Orange Free State in South Africa, affiliated with CFP in the United States.

21.

Mr. Briner thus hired Mr. Jenner with the expectation that he would make the Savannah region profitable, which it had not been for the past several years, having failed to meet revenue and market projections. In order to better finalize his integration into the Bank, Mr. Jenner surrendered his Ohio insurance license, with the intention of permitting the Bank to secure him a Georgia insurance license, compliant with Bank policy. Mr. Jenner was permitted, however, to retain certain recurring renewal insurance commission payments (or "trails") made to him on policies sold prior to his time of employment at the Bank.

22.

Mr. Jenner was employed by Bank of America Corp. Banc of America Investment Services, Inc., was responsible for managing and maintaining Mr. Jenner's securities licenses. Bank of America, National Association, is the parent company of Bank of America Investment Services, Inc., and otherwise responsible to Mr. Jenner as employer and parent company to other subsidiaries with which Mr. Jenner was involved.

23.

Mr. Jenner's base salary during his tenure at the Bank was $120,000.00 per year, plus incentives and bonuses. Mr. Jenner conservatively expected his income for the first year to amount $300,000.00 total. Mr. Jenner conservatively expected his income to build to $1,000,000.00 per year by the end of the fifth (5th) year of employment. In the first three-and-one-half (3.5) months, Mr. Jenner was directly or indirectly responsible for placing approximately $14,000,000.00 under management and in new business in the pipeline, with a potential $111,000,000.00 from genuine prospects.

24.

Early in his employment, Mr. Jenner made significant strides with potential clients, including ones who had proved difficult for the Bank to attract in the first instance. **Ultimately, the Bank recognized Mr. Jenner's strong performance by crediting him a $12,163.00 bonus in return for his efforts a mere two (2) months after beginning with the Bank**.

25.

**II.    Mr. Jenner's Problems Begin:** Due to political machinations within the Bank, Mr. Briner was terminated approximately a month after Mr. Jenner began his new job in Savannah. Mr. Briner was replaced by Michael deGolian, who was

favored by James Gallagher, the Bank's regional head for the Southeastern United States (and up until his dismissal, Mr. Briner's superior).

26.

On information and belief, in the meeting of the Private Banking Staff held to confirm Mr. Briner's termination (to which meeting he was not invited), Mr. Briner was attacked and defamed by Mr. Gallagher. The comments were made shortly before Mr. deGolian was introduced as Mr. Briner's successor. The defamatory comments continued after the meeting, requiring Mr. Briner, upon hearing of them, to demand that such conduct cease or legal remedy would be sought.

27.

Although perturbed by the unexpected dismissal of Mr. Briner, Mr. Jenner thought his position in the Bank safe. He was not, after all, a member of senior management nor a likely political target. He was also a hard worker and charismatic promoter of the Bank's services. There was, consequently, no compelling or logical reason for seeking his dismissal or reason to believe his position would likely be jeopardized by the appointment of Mr. deGolian.

28.

Despite, however, Mr. Jenner's status and function within the Bank, he was

targeted by Mr. deGolian and others (both individually and in conspiracy with one another) due to his age.

29.

Following his dismissal, the Bank would seek to destroy Mr. Jenner's reputation in order to justify his unlawful termination, in violation of the Act. The ruination of Mr. Jenner's good name would also prove necessary to safeguard the Bank's prospective customer base, especially since Mr. Jenner had never signed a non-compete agreement, yet had already proven his ability to attract client Dollars and respect.

30.

**III.  The Bank's Compliance Department was Used to Heap Indignities and Abuse on Mr. Jenner and to Provide a Pretext for Dismissal:** Mr. deGolian is a holder of a Series 24 securities license as issued by the NASD and was Mr. Jenner's superior and supervisor at the Bank following Mr. Briner's departure.  In addition to being a licensed securities broker and a supervisor for a securities broker-dealer, Mr. deGolian also has and, on information and belief, currently holds a license to sell insurance products.  As such, Mr. deGolian had a thorough understanding of Mr. Jenner's legal and regulatory obligations prior to his dismissal.

–13–

31.

Bank of America has established a Compliance Division (hereinafter "**Compliance**") in order to ensure that employees within the Bank's various departments and divisions comply with the law, regulatory rules (NASD and SEC), established industry norms, and internal Bank policy.

32.

Prior to his wrongful dismissal, Mr. Jenner, like all other employees, was required to observe Compliance's rules and policies. Compliance's supervisory function was performed in addition to Mr. deGolian's role as Mr. Jenner's superior within the Bank and his "Securities Dealer" for the purpose of NASD rules and regulations, wherein he was responsible for overseeing Mr. Jenner's activities as a securities broker. As part of routine Bank practice, Mr. Jenner was also assigned a Compliance officer, named Frank Caldwell, to review his endeavors on behalf of the Bank and clients.

33.

Mr. Jenner was reliant upon Messrs. deGolian and Caldwell to furnish him with guidance regarding Bank policies and how such policies and practices stood in relation to the law, regulatory rules, and industry norms. Mr. Jenner was especially reliant on

–14–

Messrs. deGolian and Caldwell's advice, because Bank of America's policies vary considerably from standard industry practice, requiring a degree of oversight and forbidding a range of regular, standard industry practices to a degree generally unparalleled by other banks and financial institutions.

34.

Mr. Jenner first became aware that he may have problems with Compliance shortly after he successfully worked with a prospect whom the Bank had previously courted but could not convince to invest in its products or wealth management services. Thanks to Mr. Jenner's efforts, the client agreed to transfer several Millions of Dollars in investable assets to the Bank and to permit the Bank to make a bid for his commercial business.

35.

Shortly thereafter, Mr. Jenner received an email from the client's insurance agent (who was not an employee of the Bank) giving details on the client's insurance policy, per the client's specific request. Mr. Jenner's intention had been to pass the information along to the client without comment, consistent with internal Bank policy. Mr. Jenner was unaware, however, that the email also suggested that he could act as

–15–

the policy's servicing agent (an otherwise acceptable practice in the financial services industry).

36.

**Before Mr. Jenner even knew the message was in his email inbox**, he was contacted by Messrs. deGolian and Caldwell, who demanded that Mr. Jenner explain why an outside insurance agent had suggested that he may act as the policies servicing agent. Confused, Mr. Jenner requested an opportunity to read the email. Upon its review, Mr. Jenner explained that the insurance agent did not understand Bank policy and that he could not be held accountable **for what other people wrote in email**. He also emphasized that he had never planned and would never plan to violate Bank policy by serving in the suggested capacity. **Mr. Caldwell conceded that Mr. Jenner had done nothing wrong**, although Mr. deGolian stressed that the matter would be sent for further review to Valerie Hogan (a senior Bank Compliance officer). Mr. deGolian emphasized to Mr. Jenner that "**You haven't heard the last of this**."

37.

A short time later, Mr. Caldwell informed Mr. Jenner that, despite the fact he **was wholly compliant** and that "both [he] and Mr. deGolian had the **utmost confidence in your integrity and ability to follow compliance**," all Mr. Jenner's

future emails would be reviewed by Compliance (although this was apparently something Compliance was already doing given the incident precipitated by the insurance agent's email). By the Bank's own admission, it had no cause to monitor Mr. Jenner's emails. In so doing, the Bank was detrimentally treating Mr. Jenner in a manner wholly disparate to other similarly situated, younger employees of the Bank.

38.

After that meeting, Mr. Jenner found his job increasingly difficult to perform, as Compliance, Mr. deGolian, and other Bank officer and employees acting at Mr. deGolian's behest, went on a fishing expedition through all of Mr. Jenner's correspondence and client cases.

39.

Compliance and these other individuals routinely harassed Mr. Jenner, questioning and criticizing his every action, including, by way of example, the following incidents:

(a)     Mr. Jenner submitted a proposal to a client generated using the Bank's "SmartWorks" presentation software.  The Bank's Executive Management had specifically informed all Bank employees, including Mr. Jenner, that prior submittal of such proposals to Compliance was unnecessary, because the software producing them

–17–

was *de facto* compliant. This assurance was repeated at a training course held in St. Louis, Missouri, which Mr. Jenner attended. **Despite stated Bank policy**, Mr. Jenner was, nonetheless, chastised for not submitting his "SmartWorks" proposal to Compliance for approval prior to presenting it to the client.

(b)     Mr. Jenner was called to task for an email sent by the Bank's Regional Tax Planner for the South Region regarding one client's financial needs, even though the analysis was essential to the client's welfare, was wholly complaint with established Bank policy, and an approved part of Mr. Jenner's duties.

(c)     Compliance contacted Mr. Jenner inquiring as to why several states still listed him as holding an insurance license with them. Mr. Jenner explained that the licenses were, in fact, invalid; mere holdovers that were being noted as cancelled as these states updated their records. Compliance explicitly informed Mr. Jenner that this process **was acceptable**, especially since he **had previously cancelled his Ohio Insurance License (which automatically voided every dependent insurance license Mr. Jenner registered with any other states)**. Mr. Jenner offered to accelerate the process by individually requesting that each state immediately update its records. Compliance assured him, however, that such action was wholly unnecessary. Shortly

before his termination, however, Compliance *changed its position*, and along with Mr. deGolian, stated that Mr. Jenner had, in fact, violated Bank policy.

(d)     Mr. Jenner had asked a client his sincerest desire. The client responded "a cigar box full of money." A few days later, as a friendly gag, Mr. Jenner handed the client a cigar box filled with faux dollar bills. The client was greatly amused. Compliance and Mr. deGolian were, however, quite unamused and rebuked Mr. Jenner for engaging in an "unapproved" activity.

(e)     Mr. Jenner, at approximately the same time as the cigar box incident, produced a 'certificate of graduation' for a client, congratulating him on investing even more of his assets with the Bank and upgrading his account from Bank of America's Premier Banking to Private Banking services (which was by and large a direct result of Mr. Jenner's efforts). Mr. Jenner signed the certificate as a "welcome" and "thank you" for the client's business. The client found the certificate entertaining and appreciated the effort. Compliance and Mr. deGolian were, however, displeased with the harmless gesture and ordered Mr. Jenner to cease such unauthorized activities, despite the fact that they did *not* violate Bank policy, SEC or NASD rules and regulations, or the law.

–19–

40.

Younger employees of the Bank, of lesser qualification than Mr. Jenner, but in all pertinent regards in positions of comparable authority and status to Mr. Jenner, were not subjected to the same irrational and harassing treatment that Mr. Jenner endured.

41.

Mr. Jenner always attempted to the best of his ability and in good faith to observe Compliance's rules and policies and never deliberately, willfully or negligently acted in violation of them, and never did, in fact, violate any Bank policy, regulation or applicable law.

42.

Despite his best efforts, however, Mr. Jenner found it impossible to avoid conflict with either Mr. deGolian or Compliance. In particular, Compliance and Mr. deGolian (almost from the beginning of Mr. deGolian's appointment and in a manner driven by an ageist and discriminatory animus) acted in an oppressive, arbitrary, and capricious manner towards Mr. Jenner, prohibiting a wide range of activities essential to Mr. Jenner satisfying the terms of his employment. Specifically, Compliance, operating at the behest of, and in coordination with, Mr. deGolian:

a)      Crafted an eccentric set of rules and policies for Mr. Jenner significantly at variance with established industry norms and custom;

b)      Gave vague and confusing guidelines and otherwise refused to advise Mr. Jenner as to the Bank policies applicable to his work, despite outstanding requests to do so;

c)      Insisted that Mr. Jenner's activities be evaluated on a case by case basis **subsequent to their completion,** thereby affording Mr. Jenner **no opportunity** to ensure that his activities would conform to Bank policy ***prior* to their completion**;

d)      Frequently **gave no guidelines** despite Mr. Jenner's best efforts to obtain them, and **repeatedly contradicted** prior decisions and statements made regarding Mr. Jenner's activities;

e)      Routinely **refused** to explain decisions to Mr. Jenner, instead preferring to merely state that Mr. Jenner had "violated" Bank policy, even though on the occasion that a reason was proffered, **Mr. Jenner was able to establish that he had not, in fact, violated such policy**;

f)      **Unfairly** and **inequitably** applied various rules to Mr. Jenner, in addition to crafting and overseeing a set of deprecating and erratic policies that applied exclusively to him;

g)    Through a persistent course of conduct, sought to discriminate against Mr.
Jenner due to his age.

43.

In view of his growing problems with Compliance, on or about July 15, 2005,
and August 11, 2005, Mr. Jenner contacted Mr. deGolian as his superior and Mr.
Caldwell as his Compliance officer, in an attempt to set up a meeting where they could
mutually discuss his difficulties and derive a consistent and reliable set of guidelines
within which he could operate.

44.

Despite Mr. Jenner's requests, Messrs. deGolian and Caldwell ignored his
predicament and completely failed to respond to his concerns.

45.

They did so because Mr. deGolian was striving (in coordination with Mr.
Caldwell and other Bank employees) to create Mr. Jenner's troubles, with the ultimate
goal of manufacturing the grounds for his dismissal, as a pretext for age discrimination.
Neither Messrs. deGolian or Caldwell had, consequently, any intent to nor interest in
fairly resolving Mr. Jenner's problems.

46.

Mr. Jenner also inquired of Compliance why he was being subjected to inequitable treatment, compared with other employees. It was suggested to Mr. Jenner that he refrain from asking such questions or otherwise inquiring into the propriety of the Bank's actions towards him.

47.

**IV.    Mr. Jenner is Terminated in Violation of his Rights, Due to Mr. deGolian's and Other Bank Employees' Age Biased Animus:** Instead of honoring Mr. Jenner's good faith efforts to comport himself as a responsible employee of the Bank, on August 16, 2005, Mr. deGolian instigated a surprise visit to Mr. Jenner's office in Savannah, Georgia.   In addition to Mr. Caldwell, Mr. deGolian included in his party Jacque Labelle and Valerie Hogan as senior Compliance personnel.

48.

Mr. Jenner wanted to know what was going on and why, contrary to Bank policy, he had not been informed of the visit, especially since he may well have been visiting with clients.  Mr. deGolian refused to answer Mr. Jenner's questions.

49.

Mr. Jenner was, instead, forced to stand in the hallway outside of his office for over an hour and in front of his colleagues and associates, while Mr. deGolian and his party ransacked his office and rifled through his private, personal files and effects, to which they knew had no legal right of access.

50.

After failing to find any incriminating evidence of potential wrongdoing, Mr. Jenner was summoned to a conference room to answer questions fired at him by Mr. Labelle, which questions Mr. Jenner began to realize, included some of the statements Messrs. deGolian and Caldwell had used in prior conversations with him. All told, the questioning lasted for over two hours, with Mr. Jenner frequently relegated to a bench outside the conference room and in full view of the office, while Mr. deGolian and his party discussed Mr. Jenner's responses behind **closed doors**.

51.

Not one of the questions asked of nor answers given by Mr. Jenner uncovered any wrongdoing, violation of NASD and SEC regulations, industry norms, or Bank policy.

–24–

52.

On information and belief, prior to the visit and during those periods when Mr.

Jenner was outside in the hallway, Mr. deGolian had set up the conditions leading to

Mr. Jenner's dismissal by actively defaming him to certain colleagues through libelous

and slanderous statements, which colleagues were, in addition to Mr. deGolian, key

decision makers regarding Mr. Jenner's continued employment with the Bank.

53.

The statements made by Mr. deGolian were false and published with a

discriminatory animus against and a specific intent to harm Mr. Jenner. They also

exhibited a reckless disregard of the truth.

54.

At the end of the session, Mr. Jenner was informed that he was being

suspended, effective immediately, pending a full review. When Mr. Jenner asked

what he had done wrong, Mr. deGolian refused an explanation, except to state that

he "was horrified" by Mr. Jenner's conduct. When Mr. Jenner again asked for

clarification, if for no other reason than to defend himself, Mr. deGolian would only

say that Mr. Jenner had engaged in a "pattern of behavior." Mr. Jenner again

requested clarification, but Mr. deGolian merely repeated that Mr. Jenner had engaged in an unspecified "pattern of behavior" requiring immediate suspension.

55.

In front of the entire office, Mr. Jenner was then escorted from Bank property and was forbidden from clearing his desk or office. On information and belief, Mr. deGolian thereafter went around the Savannah office, telling those present that Mr. Jenner was suspended **for cause**.

56.

Mr. Jenner's colleagues were shocked and told Mr. deGolian that Mr. Jenner was a strong and positive force in the office; that Mr. deGolian had to intervene with Mr. Gallagher as his superior to prevent Mr. Jenner's termination. Mr. deGolian feigned surprise at such statements and assured the Savannah office that he would take their concerns to Mr. Gallagher, although he had no intention of doing so and, in fact, never did.

57.

August 18, 2005, **less than five (5) months after the commencement of his employment**, Mr. deGolian informed Mr. Jenner that he was fired. Mr. Jenner once more requested to know on what grounds and again Mr. deGolian refused to answer.

–26–

58.

To date, no formal reason for Mr. Jenner's dismissal has been forth coming.

59.

In order to prevent damage to his reputation, Mr. Jenner asked whether he may be permitted to resign.  Mr. deGolian said he could do nothing (**even though Mr. Briner, as Mr. deGolian's predecessor, had permitted the individual previously holding Mr. Jenner's position to resign following a recommendation of dismissal**).

60.

On Mr. deGolian's suggestion, Mr. Jenner thereafter attempted to contact several other Bank employees in an effort to secure a resignation.  None of them bothered, however, to return his calls.

61.

On the day prior to his suspension, Mr. Jenner closed on his house in Savannah, Georgia, financed through a loan secured with Bank of America.  Mr. deGolian had known of the closing for some time.  He did nothing, however, to prevent Mr. Jenner from incurring the financial burden of a second house that he knew or suspected Mr. Jenner could not afford without an income.

62.

Mr. Jenner was neither warned by Mr. deGolian nor any other superior that he was in danger of being dismissed or the causes of such dismissal, as generally required by internal Bank policy.

63.

The Bank has adopted a personnel handbook which establishes the procedures for terminating an employee. On information and belief, the handbook provides that an employee must receive written notice of and, absent emergency circumstances, an opportunity to correct, what the employee's superior perceives as shortcomings or problem areas.

64.

Mr. Jenner never received such notice or any other opportunity to correct, challenge or evaluate the truth and accuracy of the allegations brought against him by his superiors at the Bank. He was merely suspended and then dismissed, without adequate explanation and in violation of the Bank's own internal policies and procedures.

65.

Mr. Jenner fully complied with the terms of his employment and was loyal to Bank of America, in the short time he was there bringing clients and significant revenues into the Bank's Savannah office. Despite conformity with the terms of his employment, Mr. Jenner was dismissed by the Bank, which dismissal was unwarranted, unreasonable and in violation of law and Bank of America's own internal policies and regulations (especially where for persons in Mr. Jenner's situation, resignation and not dismissal was the favored course of action).

66.

On information and belief, at fifty-eight (58) years of age, Mr. Jenner was the second oldest person in his position in the State of Georgia at the time of his termination. At approximately forty-five (45) years of age, Mr. deGolian is more than ten (10) years Mr. Jenner's junior.

67.

Neither Mr. deGolian nor any other similarly situated officers of the Bank treated comparable, younger employees in the same manner as Mr. Jenner.

–29–

68.

On information and belief, almost immediately following his dismissal, Mr. Jenner was replaced by a less qualified individual of approximately thirty years of age, or slightly over half Mr. Jenner's age.

69.

**V.     Mr. Jenner is Libeled and Defamed by the Bank to Prevent him From Competing for Bank Clients Following his Wrongful Termination:** Since Mr. Jenner is licensed with the NASD as a securities broker, it was necessary for the Bank to inform the NASD of the reasons for Mr. Jenner dismissal.

70.

All reasons given by the Bank are recorded on a Form U5 Statement (hereinafter "**U5 Statement**"), including whether the broker *resigned*, was simply *terminated*, or was *terminated for cause*, such as for violations of NASD rules and regulations.

71.

It is customary, upon the termination of an employee holding a securities, to merely not *terminated* on the U5 Statement, **without any further comment, unless there is cause note a reason for termination**.

–30–

72.

The Bank stated on Mr. Jenner's U5 Statement that he was "**Dismissed. Management's loss of confidence**" (*emphasis added*). Such comment indicated Mr. Jenner had been terminated **for cause**, due to **wrongdoing within the organization**.

73.

The statement is **false**, was published internally to key employees within the Bank prior to the issuance of U5 Statement, and has since been published publicly though the U5 Statement, including to prospective employers. The statement was published to third parties out of a **discriminatory animus, recklessly and intentionally, with a specific intent to harm** Mr. Jenner.

74.

In the months following his wrongful dismissal, Mr. Jenner has interviewed with numerous employers, both large and small, in an effort to secure an alternate position. Each and every one of these employers has turned Mr. Jenner down, despite his impressive abilities and achievements.

75.

Several prospective employers with whom Mr. Jenner interviewed (including SunTrust Bank), subsequently informed Mr. Jenner that Bank of America's comment

on his U5 Statement **unequivocally stated that he had been terminated for cause**, and that SunTrust could not take the risk of employing someone discharged for wrongdoing.  Mr. Jenner has even been turned down by wire-houses, which are well known for their less than demanding employment criteria.

76.

Due to the Bank's systematic and calculating conduct, Mr. Jenner has been reduced to marketing home mortgage insurance, a position that involves trying to sell people low-end insurance products at their homes in the evening, after they return from their daytime jobs.

77.

The position pays only commission and a mere fraction of the $300,000 to $400,000 per year Mr. Jenner was used to earning before he joined the Bank.  The position also constitutes a substantial and humiliating demotion from the high-end, Multimillion Dollar clients for whom Mr. Jenner used to construct sophisticated financial solutions and marked an end to the widespread respect he enjoyed.

78.

On information and belief, the Bank defamed Mr. Jenner to provide a **pretext** and **justification** for his unlawful dismissal.

79.

The defamation also prevented Mr. Jenner from competing with the Bank following his termination, because, like his predecessor, Mr. Jenner had not been required to sign a non-compete agreement with the Bank. The Bank had been perturbed by the success of Mr. Jenner's predecessor in attracting away Bank customers, along with Millions of Dollars in assets.

80.

The Bank thus saw the U5 Statement as an opportunity to ruin Mr. Jenner's career. By sabotaging Mr. Jenner's ability to sign up with a competitor, in other words, the Bank was eliminating Mr. Jenner's opportunity to lure away Bank clients.

81.

The Bank was able, therefore, to obtain the benefits of a non-compete without ever having to pay fair consideration for it.

82.

**VI.   Mr. Jenner Incurred Significant Costs, Damages, and Expenses:** Upon accepting the offer of employment on March 29, 2005, Mr. Jenner transferred from Cleveland, Ohio, to Savannah, Georgia, the location of his new position with the Bank.

83.

In reliance upon the offer of employment, he purchased a house with an address at 203 Pettigrew Drive, Savannah, Georgia, incurring a mortgage obligation of $343,200.00, in addition to approximately $10,000 in closing costs. Such costs were incurred over and above Mr. Jenner's continuing financial obligation for his home just outside Cleveland, Ohio (which was on the market for over a year following the relocation of Mr. Jenner and his family to Georgia).

84.

Mr. Jenner also forewent other interviewing and employment opportunities, believing and being led to believe that the Bank would continue to employ him so long as he reasonably and faithfully performed his duties.

85.

In relocating, Mr. Jenner incurred certain other expenses, including costs relating to movers, plane fare, temporary housing, storage and the refurbishment of his residence in Chagrin Falls, Ohio, so as to facilitate its sale, which costs are in excess of $65,000.00.

86.

Mr. Jenner never would have purchased the property in Savannah nor incurred the other expenses attendant upon his relocation without Bank of America's offer of employment.

87.

Upon his termination by the Bank, Mr. Jenner was forced to relocate to Atlanta, Georgia, in hopes of obtaining work, at a cost of over $5,000.00.  His mounting financial problems were compounded by his need to sell his home in Savannah as quickly as possible, since it constituted an unsupportable and continuing financial obligation.  He incurred in excess of $10,000.00 in losses on the sale.

88.

Mr. Jenner has incurred damages commensurate with the mental anguish and emotional distress Defendants inflicted upon him through a pattern of harassment.

89.

But for the Bank's wrongful course of conduct, Mr. Jenner would never have incurred the foregoing expenses, losses, and damages.

90.

The Bank is, additionally, presently in wrongful possession of an amount in excess of $23,000.00 in commissions that Mr. Jenner earned, but which the Bank has converted to its own use and otherwise stolen.

### FIRST CAUSE OF ACTION
### (AGE DISCRIMINATION)

91.

Plaintiff restates and incorporates each of the foregoing paragraphs as if fully rewritten herein.

92.

Mr. Jenner has been the target of and subject to the unlawfully discriminatory intent of Defendants and their officers, agents, and employees, in violation of 29 U.S.C. § 621 *et seq.*, the Age Discrimination Employment Act of 1967, which Act Defendants knowingly and recklessly disregarded and violated.

93.

Mr. Jenner, being over fifty-eight (58) years of age at the time of his wrongful termination, falls within the class of person contemplated as protected by the Act.

94.

Mr. Jenner was amply qualified for the position that he held in the Bank, to which position Mr. Jenner claims a right and from which he was wrongfully suspended and terminated due to the **ageist, discriminatory, and unlawful intent** of Defendants, their officers, agents and employees.

95.

Mr. Jenner was subjected to the harmful and unlawful conduct complained of herein, which other, younger employees of comparable position and status to Mr. Jenner were not subjected to.  Mr. Jenner was, furthermore, replaced by a substantially younger worker, not within the class of age protected individuals, and not as qualified for the position illicitly taken from Mr. Jenner.

96.

The Bank, Mr. deGolian and other employees, agents, and officers of the Bank, manufactured the conditions leading to Mr. Jenner's suspension and dismissal due to his age and resultant perceived undesirability as an employee.

97.

The Bank, through Mr. deGolian and its other employees, agents, and officers, acted against Mr. Jenner individually and in concert out of an **ageist animus**, and

–37–

sought to **wrongfully deprive** Mr. Jenner of his employment due to his age and otherwise in violation of 29 U.S.C. §§ 621, 623.

98.

Any contrary reason that the Bank proffers for Mr. Jenner's dismissal is **purely pretextual**, intended to distract from Defendants' true, illicit purpose.

99.

Defendants' misconduct has deprived Mr. Jenner of the use of monies and income that were lawfully his property. Due to such misconduct, Mr. Jenner requests prejudgment interest determined pursuant to 27 U.S.C. § 1961.

100.

Due to the conduct complained of herein, Mr. Jenner qualifies for benefits and other remuneration until his normal retirement at age seventy (70), in the form of front pay and future damages.

101.

Defendants' conduct, and that of their agents, officers, and employees, was wonton, willful, deliberate, outrageous and showed a reckless disregard for Mr. Jenner's rights and wellbeing and the dictates of the Act. Liquidated damages are,

–38–

accordingly, appropriate pursuant to 29 U.S.C. § 626 (b), in an amount of double the back pay award.

## SECOND CAUSE OF ACTION
## (DEFAMATION)

### 102.

Plaintiff restates and incorporates each of the foregoing paragraphs as if fully rewritten herein.

### 103.

Upon information and belief, Mr. deGolian, in addition to one or more of the officers and employees of the Bank, defamed Mr. Jenner, alleging **falsely** and **maliciously** that Mr. Jenner willfully and consistently acted in violation of Bank policy and NASD rules and regulations and otherwise failed to comport with the requirements of his position.

### 104.

Upon information and belief, false, slanderous, libelous, and malicious statements were made against Mr. Jenner by Mr. deGolian and other officers and employees of the Bank during Mr. Jenner's tenure therewith.

105.

Further, at the meeting Mr. deGolian instigated for the purpose of causing Mr.
Jenner's removal, such statements were published and republished for the purpose of
securing Mr. Jenner's suspension and eventual termination and were, in fact, the cause
thereof.

106.

Upon information and belief, Defendants' have spread and continue to publish
such false and malicious statements to third parties both within and without the Bank,
which statements evidence a **reckless disregard for the truth**.

107.

Further, Defendants entered the comment "Dismissed.  Management's loss of
confidence" upon Mr. Jenner's U5 Statement, knowing such statement meant Mr.
Jenner was **fired for cause**, due to wrongdoing, and that such comment was **false** and
**malicious** and exhibited a **reckless disregard for the truth**.

108.

Defendants libeled and slandered Mr. Jenner, both on his U5 Statement and
elsewhere, in order to furnish a **pretext** for Mr. Jenner's termination and to **disguise
Defendants' ageist animus** towards him.

–40–

109.

Defendants further libeled and slandered Mr. Jenner, both on his U5 Statement and elsewhere, for the purpose of preventing his employment in the financial services industry and protecting the Bank's prospective and current client base. Defendants especially believed such course of action necessary because Mr. Jenner had never signed a non-compete agreement and following termination, could seek to attract away Bank clients and their assets.

110.

Defendants' false and malicious statements against Mr. Jenner were intended to, did in fact, and will continue to cause Mr. Jenner harm, in violation of Section 51-5-1 of the Georgia Code, which statements are libelous **per se** as they injured Mr. Jenner's **professional reputation and ability to earn a living** .

111.

Defendants' defamatory conduct was an actual and proximate cause of the injuries Mr. Jenner complains of herein. Such conduct was, furthermore, malicious, wanton, deliberate, reckless, and engaged in with a **specific intent** to inflict harm on Mr. Jenner.

112.

In compensation, Mr. Jenner seeks the damages requested herein, including monetary and punitive damages, and a preliminary and permanent injunction and such orders as may be appropriate: (a) forbidding the continued relation of the malicious and false statements complained of herein to third parties and others within the Bank; (b) ordering the comment entered by the Bank on the U5 Statement to be expunged in its entirety without further remark by any of the Defendants named herein, including, without limitation, their agents, attorneys, employees or designees; and (c) ordering that Defendants be forced to publish, at their own expense, a notification in the Atlanta Journal-Constitution and Wall Street Journal that Mr. Jenner has (i) at all times conducted himself in an exemplary manner in full compliance with Bank policy, rules and regulations, the law and pertinent regulatory authority, and (ii) that the Bank in all regards retracts and disassociates itself from any comments it may have made to the contrary.

### THIRD CAUSE OF ACTION
### (DETRIMENTAL RELIANCE)

113.

Plaintiff restates and incorporates each of the foregoing paragraphs as if fully

rewritten herein.

114.

Shortly after his hiring by the Bank, Mr. Jenner was offered the opportunity to interview with other organizations desirous of securing an employee of Mr. Jenner's caliber.

115.

Mr. Jenner rejected all offers or potential for interview with other employers, preferring to remain loyal to the Bank and to develop what he was promised and believed was possible for the Savannah, Georgia, region.

116.

In reliance upon Bank of America's offer of employment, Mr. Jenner incurred a mortgage of $343,200 for the house located in Savannah, Georgia and other expenses in the form of closing costs, driving, plane fare, moving costs, temporary housing, storage, costs of maintaining the Savannah house (including taxes, association fees, interest payment, insurance and general maintenance) and contractors which were in excess of $65,000.00.

117.

Further, Mr. Jenner has suffered in excess of a $10,000.00 loss in selling his

house in Savannah, Georgia, which was necessary because he has been forced to relocate to Atlanta, Georgia in an attempt to secure alternate employment. In addition, Mr. Jenner could no longer afford (due to his wrongful and unlawful dismissal) the cost of maintaining the Savannah house, its mortgage, attendant community fees and tax liability.

### 118.

Mr. Jenner never would have incurred the foregoing financial obligations, but for his good faith reliance on Defendants' promise of employment and a fair and equitable work environment.

### 119.

Mr. Jenner's reliance was reasonable and the Bank induced him to incur the aforementioned costs, having direct knowledge of the expenses Mr. Jenner would incur in satisfying the benefit sought by the Bank. Such inducement was an actual and proximate cause of Mr. Jenner's injuries, for which inducement expenses Mr. Jenner seeks money damages in excess of $75,000.00.

## FOURTH CAUSE OF ACTION
## (CONVERSION)

### 120.

Plaintiff restates and incorporates each of the foregoing paragraphs as if fully rewritten herein.

### 121.

The Bank is presently in wrongful possession of an amount in excess of $23,000.00 in commissions that Mr. Jenner earned, but which the Bank has converted to its own use and otherwise stolen, in violation of Section 16-8-4 of the Georgia Code and other applicable law.

## FIFTH CAUSE OF ACTION
## (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

### 122.

Plaintiff restates and incorporates each of the foregoing paragraphs as if fully rewritten herein.

### 123.

Defendants, their agents, officers, and employees, maliciously, wantonly, deliberately, recklessly, with a specific intent to inflict harm and emotional distress on Mr. Jenner, engaged in the unlawful course of conduct complained of herein, which

–45–

course of conduct and intent is the actual and proximate cause of Mr. Jenner's injuries.

124.

Defendants' intent arose from an ageist animus towards Mr. Jenner, which animus, actions, and intent are in violation of the Act.

125.

Defendants' conduct has caused and continues to cause Mr. Jenner harm, for which harm Mr. Jenner requests the legal and equitable remedies requested herein.

## SIXTH CAUSE OF ACTION
## (INVASION OF PRIVACY)

126.

Plaintiff restates and incorporates each of the foregoing paragraphs as if fully rewritten herein.

127.

Defendants unlawfully rifled through Plaintiff's personal, private files and affects, attempting to locate incriminating evidence that they could use to harass and embarrass him and otherwise be employed to justify his unlawful dismissal.

128.

Defendants' conduct constituted a direct and unmitigated breach of Plaintiff's

right to be left alone and secure in his private affairs, as guaranteed under federal and State law.

129.

On information and belief, Defendants' violated Mr. Jenner's right to privacy in an effort to locate documents and other things that could justify and otherwise provide a pretext for Mr. Jenner's wrongful and unlawful dismissal, in violation of the Act.

130.

Due to Defendants' conduct, Plaintiff has incurred harm, for which compensation and other relief is sought.

### SEVENTH CAUSE OF ACTION
### (RESPONDEAT SUPERIOR)

131.

Plaintiff restates and incorporates each of the foregoing paragraphs as if fully rewritten herein.

132.

At all times pertinent hereto, each of the Defendants' officers and employees were acting within the scope of their employment and otherwise prosecuting and conducting the business of Defendants as employer.

133.

Accordingly, the herein named Defendants are liable and should be held liable for each of their officers' and employees' misdeeds and unlawful acts.

## EIGHTH CAUSE OF ACTION
## (MONEY DAMAGES)

134.

Plaintiff restates and incorporates each of the foregoing paragraphs as if fully rewritten herein.

135.

Defendants have unlawfully damaged Plaintiff for which Plaintiff is entitled to recover the damages requested herein, including compensatory damages, general, and punitive damages.

136.

Plaintiff is entitled to and hereby requests Defendants jointly and severally be held liable for the following special, general, and consequential damages: (a) all costs incurred in his relocation to Georgia and then from Savannah to Atlanta, Georgia, which are in excess of $75,000.00; (b) damages incurred as a result of his wrongful and illicit dismissal; (c) damages incurred as a result of Defendants' false and

malicious defamation, which together with the harm complained of in (b) above, are in an amount in excess of Three Million Six Hundred Thousand Dollars ($3,600,000.00) and as may otherwise be established during trial; (c) damages arising from Defendants' intentional infliction of emotional distress upon Plaintiff as determined by the conscience of an enlightened jury; (d) an amount in excess of $23,000.00 in moneys earned and wrongfully withheld and converted, in addition to other income; (e) interest at the statutory rate; (f) damages arising from the invasion of Plaintiff's privacy; and (g) all other costs and damages as otherwise suffered and incurred in rectifying Defendants tortious conduct and as may more fully be developed at trial.

## NINTH CAUSE OF ACTION
### (PUNITIVE DAMAGES)

137.

Plaintiff restates and incorporates each of the foregoing paragraphs as if fully rewritten herein.

138.

Defendants conduct was and continues to be unwarranted, unreasonable and outrageous, willful, malicious and intended to and did in fact specifically inflict harm on Plaintiff.

139.

As a result of Defendants conduct, Mr. Jenner requests punitive damages jointly and severally against Defendants, pursuant to Section 51-12-5.1 (f) of the Georgia Code, in a sum that will appropriately punish them for their wrongful, illegal, and intentional misconduct, undertaken with a specific intent to cause the harm complained of herein, and deter them from such conduct in the future.

## NINTH CAUSE OF ACTION
### (ATTORNEY FEES AND PREJUDGMENT INTEREST)

140.

Plaintiff restates and incorporates each of the foregoing paragraphs as if fully rewritten herein.

141.

Plaintiff served a demand letter dated December 30, 2005, on Defendants, pursuant to Section 51-12-14 of the Georgia Code, in a good faith attempt to resolve his claims without resorting to the necessity of the courts.

142.

Defendants have, however, failed to substantively respond to the letter, and have otherwise acted in bad faith and in a stubbornly litigious manner, for which Plaintiff

requests attorney fees and costs pursuant to 29 U.S.C. § 626 (b), 29 U.S.C. § 216 (b),

FED. R. Civ. P. 54, and Sections 10-5-14 and 13-6-11 of the Georgia Code.

143.

Further, Plaintiff requests prejudgment interest on all amounts awarded,

pursuant to the rights afforded under 28 U.S.C. § 1961, Sections 13-6-11 and 51-12-14

of the Georgia Code, and as otherwise permitted by law.

**TENTH CAUSE OF ACTION**
**(EQUITABLE RELIEF)**

144.

Plaintiff restates and incorporates each of the foregoing paragraphs as if fully

rewritten herein.

145.

Defendants' conduct has caused and continues to cause damage to Plaintiff's

reputation and standing in the marketplace and community, which includes

Defendants' issuance of Mr. Jenner's U5 Statement, stating he was "**Terminated.**

**Management's loss of confidence**" (*emphasis added*).

–51–

146.

Accordingly, Plaintiff requests prejudgment interest, injunctive relief, and reinstatement (or, in lieu of reinstatement, front pay and benefit for the period remaining until his normal retirement at age seventy (70)). The herein pled injunctive and equitable relief is essential to Mr. Jenner obtaining complete recovery, for which money damages alone are wholly insufficient.

147.

Plaintiff also requests an order mandating the Bank publish, at its own expense, a notification in the Atlanta Journal-Constitution and Wall Street Journal that Mr. Jenner has at all times conducted himself in an exemplary manner in full compliance with Bank policy, rules and regulations, the law and pertinent regulatory authority.

148.

Plaintiff requests, furthermore, that the Bank retract the aforementioned comment on Mr. Jenner's U5 Statement and inform the NASD that Mr. Jenner engaged in no wrongdoing, but always comported himself consistent with Compliance's rules, industry norms, and all applicable legal and regulatory standards, and cause the same to be entered upon the U5 Statement.

149.

Plaintiff additionally requests that Defendants be enjoined from engaging in discriminatory and defamatory conduct, restore him to his rightful place as a vice president of the Bank with the title of private client advisor or, in lieu of reinstatement, an order of front pay and benefits for the period remaining until his normal retirement at age seventy (70).

## ELEVENTH CAUSE OF ACTION
## (DECLARATORY RELIEF)

150.

Plaintiff restates and incorporates each of the foregoing paragraphs as if fully rewritten herein.

151.

Defendants have engaged in an unlawful course of conduct that contravenes the Act and Mr. Jenner's rights.

152.

Plaintiff requests, accordingly, that Defendants' conduct be declared in violation of his rights and otherwise in contravention of applicable law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for orders, relief, recovery and judgment against Defendants, jointly and severally, as follows:

(A)  A declaration that Defendants' conduct was in violation of Plaintiff's rights, the Act, and other applicable law;

(B)  An order enjoining Defendants from engaging in such violative conduct;

(C)  An order restoring Plaintiff to his rightful place as a vice president of the Bank with the title of private client advisor or, in lieu of reinstatement, an order of front pay and benefits for the period remaining until his normal retirement at age seventy (70);

(D)  An award of equitable relief of back pay and benefits up to the date of reinstatement, or front pay and benefits accrual;

(E)  An award of special, compensatory, general, and punitive damages in the following amounts: (a) all costs incurred in his relocation to Georgia, and then from Savannah to Atlanta, Georgia, which are in an amount in excess of $75,000.00; (b) damages incurred as a result of his wrongful and illicit dismissal; (c) damages incurred as a result of Defendants' false and malicious defamation of Mr. Jenner, which together with the harm

-54-

complained of in (b) above, are in an amount in excess of Three Million Six Hundred Thousand Dollars ($3,600,000.00) and as may otherwise be established during trial; (c) damages arising from Defendants' intentional infliction of emotional distress upon Plaintiff as determined by the conscience of an enlightened jury; (d) an amount in excess of $23,000.00 in moneys earned and wrongfully withheld and converted, in addition to other monies; (e) interest at the statutory rate; (f) damages arising from Defendants' invasion of Plaintiff's privacy; (g) interest at the statutory rate; (h) prejudgment interest pursuant to the Act, 28 U.S.C. § 1961, and Section 51-12-14 of the Georgia Code; (i) liquidated damages of double the back pay awarded; (j) general damages; (k) punitive damages in an amount determined by the conscience of an enlightened jury for Defendants' conduct, which was motivated by a specific intent to harm Plaintiff; and (l) all other costs and damages as otherwise suffered and incurred in rectifying Defendants tortious conduct and as may more fully be developed at trial;

(F)     Attorneys fees and costs of litigation pursuant to 29 U.S.C. § 626 (b), 29
        U.S.C. § 216 (b), FED. R. Civ. P. 54, and Section 13-6-11 of the Georgia
        Code; and

(G)     Equitable relief, in the form of an order: (i) requiring the Bank to fully
        retract the comment "Terminated. Management's loss of confidence"
        from Mr. Jenner's U5 Statement; (ii) requiring the Bank to inform the
        NASD that Mr. Jenner engaged in no wrongdoing, but always comported
        himself consistent with Compliance's rules, industry norms, and all
        applicable legal and regulatory standards; (iii) causing the Bank to enter
        the same upon the U5 Statement; (iv) instructing the Bank to publish, at
        its own expense, a notification in the Atlanta Journal-Constitution and
        Wall Street Journal that Mr. Jenner has at all times conducted himself in
        an exemplary manner in full compliance with Bank policy, rules and
        regulations, the law and pertinent regulatory authority; (v) enjoining the
        Bank from engaging in discriminatory and defamatory conduct; (vi)
        directing the Bank restore Mr. Jenner to his rightful place as a vice
        president of the Bank with the title of private client advisor or, in lieu of
        reinstatement, an order of front pay and benefits for the period remaining

until his normal retirement at age seventy (70); and (vii) awarding such

equitable and legal relief and orders as are just and warranted by the facts

and circumstances of the instant case.

(H)   A preliminary and permanent injunction prohibiting (a) the continued

relation of the malicious and false statements complained of herein to

third parties and others within the Bank and (b) the Bank and its

employees from engaging in discriminatory conduct, in violation of the

Act.

### JURY TRIAL DEMANDED

In respect of the foregoing, Plaintiff Brian J. Jenner demands a jury to try all

claims triable thereby.

## CERTIFICATE OF TYPE AND FORMAT

Pursuant to Local Rule 5.1, the undersigned counsel for Plaintiff hereby certifies that the foregoing Complaint has been prepared with a font size and point selection (Times New Roman, 14 pt.) approved, and with the margins, paper, counsel identification, citations, numbering, captions, and in the form required, by the Court.

Simon Jenner
Georgia Bar No. 142588