IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BRIAN J. JENNER,

        Plaintiff,

v.

BANK OF AMERICA CORPORATION,
BANC OF AMERICA INVESTMENT
SERVICES, INC., and BANK OF
AMERICA, NATIONAL ASSOCIATION,

        Defendants.

CIVIL ACTION
NO. 1:06-cv-01092-GET

---

## O R D E R

The above-styled matter is presently before the court on:

1) defendants Bank of America Corporation, Banc of America Investment Services, Inc., and Bank of America, National Association's motion for summary judgment [docket no. 133]; and

2) defendants' motion to seal transcript of Mark E. James [docket no. 40].

On May 8, 2006, plaintiff Brian Jenner filed suit against defendants Bank of America Corporation, Banc of America Investment Services, Inc., Bank of America, National Association, and Michael DeGolian. Plaintiff filed his complaint with this court pursuant to 28 U.S.C. § 1331, seeking enforcement of a federal right pursuant to the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216.  Pursuant to 28 U.S.C. § 1367,

plaintiff's complaint further alleges state law causes of action for defamation, detrimental reliance, conversion, intentional infliction of emotional distress, and invasion of privacy. Plaintiff voluntarily dismissed defendant Michael DeGolian without prejudice on June 28, 2006.

Defendants filed their motion for summary judgment on April 9, 2007.  Plaintiff filed his response on April 30, 2007.  On May 17, defendants filed their reply brief in support of their motion for summary judgment.  Defendants filed a motion to seal the deposition transcript of Mark. E. James on April 10, 2007.  As of the date of this order, plaintiff has not responded to defendant's motion to seal.

**Defendants' Motion to Seal**

Defendants' motion to seal requests that the deposition transcript of Mark E. James be filed under seal, as the transcript may contain personal and confidential information pertaining to plaintiff.  Plaintiff did not file a response opposing the motion.

Local Rule 7.1B requires that "any party opposing a motion shall serve the party's response...not later than ten (10) days after service of the motion," and further provides that, "[f]ailure to file a response shall indicate that there is no opposition to the motion."  LR 7.1B, ND Ga.  As of the date of this order, plaintiff has not responded to defendants' motion for to seal [docket no. 140], which included a certificate of service.

Accordingly, the court GRANTS AS UNOPPOSED defendants' motion to seal the deposition transcript of Mark E. James [docket no. 140].

**Defendants' Motion for Summary Judgment**

Standard

Courts should grant summary judgment when "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party must "always bear the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). That burden is 'discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Id. at 325; see also U.S. v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991).

Once the movant has met this burden, the opposing party must then present evidence establishing that there is a genuine issue of material fact. Celotex, 477 U.S. at 325. The nonmoving party must go beyond the pleadings and submit evidence such as affidavits, depositions and admissions that are sufficient to demonstrate that if allowed to proceed to trial, a jury might return a verdict in

his favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986).  If he does so, there is a genuine issue of fact that requires a trial.  In making a determination of whether there is a material issue of fact, the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  <u>Id.</u> at 255; <u>Rollins v. TechSouth, Inc.</u>, 833 F.2d 1525, 1529 (11th Cir. 1987).  However, an issue is not genuine if it is unsupported by evidence or if it is created by evidence that is "merely colorable" or is "not significantly probative." <u>Anderson</u>, 477 U.S. at 249-50.  Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case.  <u>Id.</u> at 248.  Thus, to create a genuine issue of material fact for trial, the party opposing the summary judgment must come forward with specific evidence of every element essential to his case with respect to which (1) he has the burden of proof, and (2) the summary judgment movant has made a plausible showing of the absence of evidence of the necessary element.  <u>Celotex</u>, 477 U.S. at 323.

Facts

In light of the foregoing standard, the court finds the following facts solely for the purpose of deciding this motion for summary judgment.  Plaintiff was employed by both the Banc of America Investment Services, Inc. ("BAI") and Bank of America, N.A. ("the Bank"), from March 31, 2005, through August 18, 2005.  When

Page 4

the Bank hired plaintiff in March 2005 as a Private Client Advisor ("PCA"), plaintiff was fifty-eight years of age.   Prior to his employment with the Bank, plaintiff worked in the insurance and estate and financial planning industries.   Plaintiff interviewed with Bank of America sometime between December 2004 and January 2005.   Prior to the start of plaintiff's employment with the Bank, plaintiff met with several members of the Georgia Private Bank, including Michael DeGolian.

As part of his employment with the Bank, plaintiff was required to fill out a form entitled "Outside Activity Approval Request Form."   The form states: "Pursuant to BAI's policy on outside activities, I hereby request approval to participate in the activity described below.   I also acknowledge that I am not permitted to engage in any outside activity without the prior written approval of my Manager and/or Registered Principal." Within the form, plaintiff disclosed several trail commissions he received from prior insurance sales.   The form further states: "Brian Jenner was formerly employed in the insurance sales business, but is no longer engaged in the sales or servicing of this business or former clients. [He] continue[s] to receive between $12k and $20k per year of trail type commissions from the former employer or insurance company. . ."   There are ten (10) trail commissions disclosed on the form.   The form states that

plaintiff's receipt of the trail commissions will be permitted under the following conditions:

- You may not be appointed with any insurance company or carrier, unless [BAISI] requires this to hold his license in a dormant manner. Specifically, you may not be appointed with your former insurance company or affiliated carriers to facilitate the receipt of these trail commissions. . .
- Any appointment with any insurance company or carrier outside of the above description or against Bank, BAI or BAISI policy has been canceled and is hereby confirmed.
- At no time may you sell or provide service to former, current or future clients for insurance, annuity or similar products. . .
- You must update the Market Executive immediately if any changes occur to this arrangement. . .

When plaintiff began his employment as a PCA, Joseph Briner was his manager. Several weeks later, Mr. Briner left the Bank and Mr. DeGolian was promoted Market Executive for the Georgia Private Bank and became plaintiff's direct supervisor. After Mr. DeGolian became plaintiff's supervisor, plaintiff alleges that he inquired as to why a press announcement regarding plaintiff's employment had not been published and why publicity photos had not been taken. Plaintiff maintains that such a press announcement is a part of the Bank's routine promotion of employees in key leadership and sales roles. Plaintiff states that Mr. DeGolian's response was "lukewarm, emphasizing that because [plaintiff] 'was older' [he] should have [his] picture airbrushed." The press announcement was never published. An e-mail message from Michael DeGolian to Darcele Griffin, dated May 9, 2005, asks Ms. Griffin to "please

arrange to have a press releasr [sic] created for Brian Jenner in Savannah." Joseph Briner testified that it was his responsibility to have the press announcement published for plaintiff.

As part of his employment, plaintiff was provided with a BAI Compliance Manual for Private Bank. Plaintiff was to review the manual and refer to it whenever a compliance related question arose. Plaintiff signed a form which stated: "By signing [this form], you will be certifying that you have reviewed the manual and will comply with the policies it contains." The section entitled "Supervisory Review" of the Compliance Manual states that "Registered Representatives in the Private Bank may not create their own advertising and sales literature" and that "Registered Representatives may only use pre-approved advertising and sales literature or correspondence. . ."

The section entitled "Insurance Products/Referral Process" of the BAI Compliance Manual states:

> Private Bank Registered Representatives are not permitted to sell insurance products directly to a client. However, they may **refer** domestic clients only to Bank of America Insurance Services, Inc. (BAISI), a licensed affiliate insurance agency partner and nonbank subsidiary of Bank of America, N.A., that can offer insurance products.
> . . .
> While the Private Bank Registered Representative may attend client meetings when insurance is discussed, they may not:
> - directly sell an insurance product;
> - hold themselves out as an insurance expert, analyst or advisor;

- directly provide an insurance application or document through which a client may obtain insurance coverage;
- answer detailed questions or comment on information about insurance;
- accept insurance premium payments; or
- deliver the insurance policy.

The Compliance Manual's section entitled "Selling Practices – Prohibited Business Practices" outlines several practices which may violate a broker dealer's responsibility for fair dealing with clients. Specifically, employees are not permitted to "[f]orge clients' signatures or have them sign blank forms."

As it did with all of its Private Bank employees, the Bank monitored all of plaintiff's incoming and outgoing e-mails, through the Bank's Assentor system. Plaintiff was aware that his e-mails were monitored. The Assentor system monitored Private Bank employees' e-mail messages, searched those e-mails for certain content and flagged messages for human review. When he became plaintiff's manager in April 2005, Mr. DeGolian's duties included reviewing Private Client Advisors' e-mail messages that were brought to his attention by the Bank's compliance team. Mr. DeGolian designated Frank Caldwell to review e-mail messages flagged by the Assentor system. Mr. Caldwell then brought to Mr. DeGolian's attention those e-mail messages identified for further review by the Assentor system.

Soon after joining the Bank, plaintiff attended a meeting in St. Louis where he inquired as to why the Private Bank division was

denied the ability to sell insurance.  According to Mr. DeGolian, plaintiff's comments "raised a red flag."  Mr. DeGolian spoke to plaintiff about his comments regarding the sale of insurance in the Private Bank division.   Around  the  same  time,  Mr.  Caldwell performed an e-mail review of plaintiff's e-mails and discovered emails that raised his suspicion because, in his view, the e-mails contained  conversations  concerning  insurance  products.   While plaintiff disputes that these e-mails could have been a legitimate cause of concern, plaintiff fails to provide evidence refuting Mr. Caldwell's personal belief regarding the content of the e-mails. See L.R. 56B (2)(a)(2) ("This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's  fact  with  concise  responses  supported  by  specific citations to evidence").  Mr. Caldwell spoke to plaintiff about the e-mails and reminded him of Bank policy.

Lauren Henry, one of plaintiff's co-workers, also testified that Mr. DeGolian requested that she speak with plaintiff to "tell him to be careful about what he does."   In early August 2005, Valerie Hogan testified that she, along with Jack Labelle and Frank Caldwell, decided to more carefully scrutinize plaintiff's e-mails. Ms.  Hogan  further  testified  that  in  August  2005,  Mr.  Labelle recommended  that  she,  Mr.  DeGolian  and  Mr.  Labelle  visit  the Savannah office to interview plaintiff.

On August 16, 2005, Mr. DeGolian, Mr. Labelle, and Ms. Hogan visited the Savannah office of the Bank, where plaintiff's office was located. During the visit, plaintiff met with Mr. Labelle, Ms. Hogan and Mr. DeGolian. During the visit, plaintiff's office was examined by Mr. DeGolian, Mr. Labelle, and/or Ms. Hogan and it was discovered that plaintiff had a blank BAI form signed by a trust officer with the Bank in his possession. Mr. Labelle also testified that he believed that plaintiff had not cancelled all of his insurance licenses and appointments. Mr. Labelle further believed that plaintiff was receiving undisclosed trail commissions. Ms. Hogan testified that it was her belief that plaintiff placed an advertisement without having it properly filed within the OSJ. It also was discovered that plaintiff accessed a computer program known as "Perspectives on Planning" ("POP"), which is a financial and estate planning tool. Plaintiff gained access to the program with the password and access of another employee, Brian Coulter. Mr. Labelle testified that it was a violation of Bank policy for plaintiff to access the POP software. The Bank also discovered that plaintiff prepared and provided a certificate to a client that was not pre-approved by the Bank and Mr. Labelle testified that the certificate did not meet Bank marketing standards.

Plaintiff was suspended from his position on August 16, 2005. On August 17, 2005, Mr. Labelle, Ms. Hogan and Mr. DeGolian

presented their findings on a conference call to other individuals, including Jim Gallagher, the Regional President, Jay Norton, the compliance officer, and Kim Cross, a Human Resources representative. Ms. Hogan testified that the decision to terminate plaintiff was made by a number of individuals. Mr. DeGolian testified that everyone on the conference call voted to terminate plaintiff and that plaintiff was terminated because of "a series of actions that illustrated poor judgment." Plaintiff was officially discharged from the Bank on August 18, 2005.

Jay Norton testified that the Bank has a responsibility to accurately and fairly report information on a U-5 Uniform Termination Notice with the National Association of Securities Dealers ("NASD"). Based upon information he received, Jay Norton recommended that the Bank state the reason for plaintiff's termination as "management's loss of confidence." The Bank filed a U-5 Uniform Termination Notice with the NASD for plaintiff and stated that the reason for plaintiff's termination was "[m]anagement's loss of confidence."

Discussion

**Plaintiff's Claim under the ADEA**

Plaintiff's complaint contends that he was fired by defendants because of his age, in violation of the ADEA. Under the ADEA, it is unlawful for an employer "to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). "Under

the ADEA, a plaintiff claiming disparate treatment bears the ultimate burden of proving that age was a determining factor in the employer's decision to fire him or her." <u>Carter v. Miami</u>, 870 F.2d 578, 581 (11th Cir. 1989). A plaintiff is initially required to establish a *prima facie* case of discrimination through one of three methods: "by direct evidence of discriminatory intent; by meeting the four-pronged test set out for Title VII cases in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 688 (1973); or through statistical proof." <u>Id.</u> In the case at bar, plaintiff attempts to prove a *prima facie* case of discrimination through the first two methods.

Plaintiff first contends that there is direct evidence of discrimination in the present case. "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." <u>Id.</u> at 582-83 (citation omitted). Direct evidence of discrimination must reflect "'a discriminatory or retaliatory attitude correlating to the *discrimination or retaliation complained of* by the employee.'" <u>Carter v. Three Springs Residential Treatment</u>, 132 F.3d 635, 641 (11th Cir. 1998) (quoting <u>Caban-Wheeler v. Elsea</u>, 904 F.2d 1549, 1555 (11th Cir. 1990)). Direct evidence of discrimination must show that the adverse employment decision was motivated by the decision-maker's ageism. <u>Damon v. Fleming Supermarkets, Inc.</u>, 196 F.3d 1354, 1358-59 (11th Cir. 1999). Thus, "'only the most blatant

Page 12

remarks, whose intent could be nothing other than to discriminate on the basis of age' will constitute direct evidence of discrimination." Id. at 1359 (citations omitted); see also Earley v. Champion Int'l Corp., 907 F.2d 1077, 1082 (11th Cir. 1990) (noting that direct evidence "would be a management memorandum saying, 'Fire Earley -- he is too old.'").

Plaintiff contends that a statement made by Michael DeGolian, plaintiff's manager, that plaintiff should air-brush a photograph of himself for a press announcement because he is "older" constitutes direct evidence of discrimination. In his response to defendants' motion for summary judgment, plaintiff contends that because of this statement, plaintiff suffered an adverse employment action in that his press announcement was not published, and further that Mr. DeGolian's statement evidences his intent to fire plaintiff because he was "older."

The court initially notes that plaintiff fails to provide any support for his contention that Mr. DeGolian was responsible for the publishing of plaintiff's press announcement, or that plaintiff suffered an adverse employment action as a result of the announcement not being published. Defendants present evidence that Mr. DeGolian instructed his assistant to have a press announcement created for plaintiff, and Joseph Briner, plaintiff's former manager, testified that publication of the press announcement "would have been up to [Mr. Briner] to make sure that happened."

The court further finds that the statement by Mr. DeGolian is not direct evidence of discrimination because it requires the court to infer that Mr. DeGolian's intent in encouraging plaintiff to appear younger in his press announcement photograph was because of discrimination. While such a statement may provide circumstantial evidence of discriminatory intent, it fails to prove, without inference, a discriminatory motive on Mr. DeGolian's part with regard to plaintiff's termination, and thus cannot be direct evidence of discrimination. See Burrell v. Bd. of Trs. of Georgia Military Coll., 125 F.3d 1390, 1393-94 (11th Cir. 1997) (holding that evidence which suggests, but does not prove, a discriminatory motive is circumstantial evidence by definition). Accordingly, as this was the only piece of alleged direct evidence cited by plaintiff, the court finds that plaintiff fails to sufficiently allege direct evidence of discrimination.

Plaintiff also maintains that he establishes a *prima facie* case of discrimination through the McDonnell Douglas test.  The Eleventh Circuit Court of Appeals has adopted a variation of the four-pronged test for Title VII claims outlined in McDonnell Douglas to analyze discrimination claims under the ADEA.  Carter, 870 F.2d at 582.  For a plaintiff to establish a prima facie case of discrimination under the ADEA with circumstantial evidence, he must prove:

> (1) that he is a member of the protected group;

Page 14

> (2) that adverse employment action was taken
> against him, e.g. discharge, demotion, or failure
> to hire; (3) that he was replaced by a person
> outside the protected group; and (4) that he was
> qualified for the position for which he was
> rejected.

Id. (citations omitted).

In their motion for summary judgment, defendants concede that plaintiff meets the first three prongs of the test but argue that plaintiff was no longer qualified to perform his position at the time he was terminated because plaintiff "insisted on performing his duties in a manner prohibited by the Bank." In cases analyzed under the ADEA, the court must focus on the plaintiff's "skills and background to determine if they were qualified for a particular position." Clark v. Coats & Clark, 990 F.2d 1217, 1227 (11th Cir. 1993). If a plaintiff has enjoyed a long tenure at a certain position, a court may infer that he is qualified to hold the particular position. Damon, 196 F.3d at 1360. In the present case, where plaintiff was employed for approximately five (5) months, this presumption would not apply and plaintiff must still show that he was qualified for the position he held before his termination.

After reviewing the evidence cited by both parties, the court finds that plaintiff presents sufficient evidence to establish that he was qualified for the position of Private Client Advisor, from which he was fired. Specifically, Joseph Briner, plaintiff's initial manager, testified at his deposition that he received "very

Page 15

good feedback from the commercial group, from two trust officers, from the investment officer, from the private client manager, from the retail banking area" about plaintiff while Mr. Briner was with Bank of America. Michael DeGolian, plaintiff's manager after Mr. Briner left the Bank, testified at his deposition that plaintiff was not fired because of his failure to live up to the job description for Private Client Advisors. This evidence establishes that plaintiff was qualified for his job as a Private Client Advisor, and thus the court finds plaintiff sufficiently establishes a *prima facie* case of discrimination.

Once the plaintiff has established a *prima facie* case of discrimination under the ADEA, a presumption of discrimination arises and the burden then shifts to the employer to proffer legitimate, nondiscriminatory reasons for its decision to terminate the plaintiff's employment. Damon, 196 F.3d at 1361. If the employer successfully identifies such reasons, the burden shifts back to the plaintiff to prove that the proffered reasons are mere pretext for age discrimination. Id. (citation omitted). "[A] defendant may terminate an employee for a good or bad reasons without violating federal law," and courts "are not in the business of adjudging whether employment decisions are prudent or fair." Id. (citation omitted). The sole concern of the court is whether unlawful discriminatory animus motivated the plaintiff's termination. Id. (citation omitted).

In the present case, defendants contend that plaintiff was terminated for engaging "in conduct which was prohibited by the terms of his employment relationship with the Bank." Specifically, defendants state that plaintiff was terminated for engaging in the following conduct: attempting to provide insurance advice to clients, using planning software and materials which plaintiff was not authorized to use, receiving trail commissions from undisclosed sources, sharing private client information with plaintiff's son, and creating marketing materials that plaintiff was not authorized to create or use. Defendants contend that "the Bank terminated plaintiff's employment because it could not be confident that plaintiff would abide by the terms and conditions of his employment, or the Bank's policies and practices." Defendants maintain that even if plaintiff can prove that the above-cited violations did not occur, the Bank's honest belief of any of the violations is a sufficient reason to sustain their burden.

Defendants' burden at this stage "is merely one of production; it need not persuade the court that it was actually motivated by the proffered reasons" and is sufficient if defendants' evidence "raises a genuine issue of fact as to whether it discriminated against the plaintiff." Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) (internal quotations and citation omitted). Defendants sufficiently allege several legitimate nondiscriminatory reasons for terminating plaintiff's employment

and provide testimony and documentary evidence to support the reasons. Plaintiff further fails to provide sufficient evidence that defendants did not have an honest belief in the nondiscriminatory reasons for plaintiff's termination. See EEOC v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176-77 (11th Cir. 2000) (affirming summary judgment for defendant where employee was fired for lying in investigation, and plaintiff offered no evidence that defendant lacked a good faith belief that employee had lied).

Once the employer has presented one or more legitimate, nondiscriminatory reason for terminating an employee, the presumption of discrimination is eliminated and the burden shifts to the plaintiff. Chapman, 229 F.3d at 1024. "'[T]he plaintiff retains the burden of persuasion [of showing intentional discrimination]. He may succeed in this either directly by persuading the [factfinder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Beaver v. Rayonier, Inc., 200 F.3d 723, 727 (11th Cir. 1999) (quoting United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S. Ct. 1478, 1482 (1983)). In the present case, plaintiff attempts to do both.

Plaintiff initially argues that the fact that he was discharged following a change in management provides good evidence of age discrimination. Plaintiff contends that his "maltreatment

commenced almost immediately after Mr. Briner left the Bank and was replaced by Mr. DeGolian." The cases cited by plaintiff, however, are not factually similar to the present case. In <u>United States Equal Opportunity Commission v. Century Broadcasting Corporation</u>, 957 F.2d 1446 (7th Cir. 1992), the new general manager of a radio station fired six of the seven existing radio announcers, all of which were over the age of forty, and decided to keep the remaining announcer, who was twenty-seven years old. 957 F.2d at 1452. In that case, evidence also was presented that the reasons for termination given by the new manager were untrue. <u>Id.</u> at 1453. In <u>Buckley v. Hospital Corporation of America, Inc.</u>, 758 F.2d 1525 (11th Cir. 1985), the new administrator of a hospital stated that the hospital needed "new blood" and that he intended to recruit younger doctors and nurses, expressed surprise at the longevity of staff members, and commented on the plaintiff's "advanced age" causing her stress on the job. 758 F.2d at 1530. In both of the cases cited by plaintiff, there was a change of management accompanied by other evidence from which a jury could conclude that the defendants acted with discriminatory intent. Accordingly, the fact that plaintiff was terminated after a change in management does not necessarily support a finding of discrimination in the present case.

Plaintiff also states that the Bank deviated from its well-established procedure in terminating plaintiff and that this can

serve as a basis for a wrongful discharge claim. Specifically, plaintiff contends that the Bank failed to give him written or verbal warnings about his conduct, despite the fact that Bank policy required such warnings. Plaintiff also alleges that Michael DeGolian had a duty to properly document disciplinary actions taken against plaintiff and that the Bank failed to interview his co-workers regarding plaintiff's termination. Plaintiff relies on several cases from the First, Fifth, and Tenth Circuit Courts of Appeal to support his contention that the Bank's deviation from its procedure provides evidence of discrimination. The Eleventh Circuit, however, has held that, "[s]tanding alone, deviation from a company policy does not demonstrate discriminatory animus." Mitchell v. USBI Co., 186 F.3d 1352, 1355-56 (11th Cir. 1999).

Plaintiff further maintains that he was treated disparately to younger employees at the Bank. Specifically, plaintiff argues that Michael Kemp, plaintiff's predecessor, was given favorable treatment in that he was allowed to resign from the Bank with a clean U5 Statement after engaging in "serious improprieties." Plaintiff further contends that Lauren Henry engaged in a violation of Bank policy and was only verbally disciplined and was notified of her violation immediately, whereas plaintiff was not notified until months after he allegedly violated Bank policy.

A plaintiff alleging disparate treatment may establish a *prima facie* case by showing "that the misconduct for which the employer

discharged the plaintiff was the same or similar to what a similarly situated employee engaged in, but that the employer did not discipline the other employee similarly." <u>Lathem v. Dept. of Children & Youth Servs.</u>, 172 F.3d 786, 792 (11th Cir.1999). With regard to Michael Kemp, defendant presents evidence that Mr. Kemp was over the age of forty, and thus was within plaintiff's protected class. See <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997) ("[T]he plaintiff must show that his employer treated similarly situated employees outside his classification more favorably than herself."). In addition, plaintiff fails to present sufficient evidence that plaintiff's violations of Bank policy are sufficiently similar to Mr. Kemp's violations, including the fact that Mr. Kemp and plaintiff were terminated by different decision-makers. See <u>Silvera v. Orange Co. School Bd.</u>, 244 F.3d 1253, 1259 (11th Cir. 2001) (finding that "the comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges"); see also <u>Patterson v. Avery Dennison Corp.</u>, 281 F.3d 676, 680 (7th Cir. 2002) (noting that factors to determine whether employees are similarly situated include whether they were evaluated by the same decision-maker). Thus, the court cannot find that plaintiff was treated differently from Mr. Kemp because of his age. See <u>EEOC v. Jefferson County Sheriff's Dep't</u>, 467 F.3d 571, 580 (6th Cir. 2006) (noting that "disparate treatment occurs when

'[t]he employer simply treats some people less favorably than others because of their' protected trait").

With regard to Lauren Henry, plaintiff alleges Ms. Henry sent an improper, unsecured email message and was verbally disciplined for doing so. Plaintiff also alleges that Ms. Henry was involved in the joke diploma for which plaintiff was disciplined but Ms. Henry was not disciplined. While plaintiff presents evidence of Ms. Henry's violations of Bank policy, the court finds that plaintiff and Ms. Henry are not similarly situated employees. See Holifield, 115 F.3d at 1562 ("To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects."). Defendant presented testimony from Valerie Hogan, one of the Bank employees involved in plaintiff's termination, that she was not aware that Ms. Henry played a role in the joke diploma for which plaintiff was disciplined. There are also several violations of Bank policy cited by the Bank in support of plaintiff's termination which Ms. Henry did not commit. Plaintiff fails to show that plaintiff and Ms. Henry were accused "of the same or similar conduct and [were] disciplined in different ways," and thus the court finds that they are not similarly situated employees. Id. (citation omitted).

Plaintiff argues that unlawful discrimination can further be inferred from the Bank's shifting reasons for terminating plaintiff

and its alleged manipulation of witnesses.  Plaintiff argues that several of the Bank's employees testified that plaintiff was fired for different reasons.  The cases plaintiff cites, however, are cases where a decision-maker changed their reasons for firing an employee over time.  See Newhouse v. McCormick & Co., 110 F.3d 635, 640 (8th Cir. 1997) (finding that because decision-maker's non-discriminatory reasons for not hiring the plaintiff were "various and always changing," his motive became suspect); Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 106 (2d Cir. 2001) (finding that a jury could view a decision-maker's changing explanation for not hiring the plaintiff as pretext for discrimination).  The evidence presented by plaintiff does not show that the Bank changed its reasons for terminating plaintiff's employment.  The decision-makers involved with plaintiff's termination, including Mr. Labelle, Ms. Hogan, and Mr. DeGolian, testified that they believed that the combined effect of plaintiff's multiple violations of Bank policy caused the decision-makers to lose confidence in plaintiff's ability to perform in his capacity as a Private Client Advisor for the Bank, including plaintiff's conduct regarding providing insurance services to clients and plaintiff's issuance of a certificate to a client.

Finally, plaintiff contends that the Bank's reasons for terminating plaintiff are untrue pretext and attempts to disprove each of the reasons set forth by defendants for plaintiff's

termination. In its motion for summary judgment, the Bank provides the following reasons to support plaintiff's termination from the Bank: plaintiff "challenged" a high-ranking Bank official, plaintiff provided insurance information to clients, plaintiff used planning software and materials which he was not authorized to use, plaintiff received trail commissions from undisclosed sources, plaintiff shared private client information with his son and created marketing materials he was not authorized to create or use, plaintiff had in his possession blank signed forms from a client, plaintiff had not canceled his insurance licenses and appointments in other states, and plaintiff published an advertisement without permission from the Bank.

In his response to defendants' motion for summary judgment, plaintiff disputes each reason the Bank provides in support of plaintiff's termination. Specifically, plaintiff disputes defendants' characterization of his discussion with a high-ranking Bank official in St. Louis. Plaintiff also acknowledges that he had discussions with outside insurance agents, but that he merely passed along information to other Bank employees. Plaintiff admits that he had a blank, signed form from a client in his possession, but argues that the client gave him the form on his own accord. Plaintiff also admits that he had insurance licenses and appointments during his employment at the Bank, but that it was his former employer's responsibility, and not his own responsibility,

to cancel the licenses and appointments. With regard to the receipt of undisclosed trail commissions, plaintiff argues that Mr. Labelle testified that plaintiff did not receive such commissions. Plaintiff acknowledges that he published an advertisement, but argues that Mr. DeGolian approved the publication of the ad. With regard to the planning software, plaintiff admits that he used another employee's password to access the system, but argues that it was the employee's fault for giving plaintiff his password. Finally, with regard to the marketing materials, plaintiff maintains that he created a joke diploma for a client which was not something that Bank policy required pre-approval for plaintiff to create, and that other employees involved were not disciplined for their role in creating the diploma.

"A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer," and as long as the employer's proffered reason is one that could motivate a reasonable employer, "an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman, 229 F.3d at 1030. The Eleventh Circuit has recognized that:

> federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere.

> Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior."

Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted)).

After reviewing defendants' reasons given to support the Bank's determination to fire plaintiff and plaintiff's arguments against such reasons, the court finds the reasons proffered by defendants meet the test of being ones that might motivate a reasonable employer. For many of the reasons given by defendants for their decision to terminate plaintiff, plaintiff admits to engaging in the conduct but attempts to argue that he should not have been terminated despite his conduct. For example, the record indicates that defendants believed plaintiff received trail commissions that he did not disclose to the Bank, despite the Bank's request that plaintiff disclose all trail commissions he was to receive during his employment. In addition, the decision-makers involved in the decision to terminate plaintiff also testified that they believed that plaintiff's creation of the joke diploma was a violation of the Bank's marketing policy. The decision-makers also testified that they were concerned with plaintiff's conduct regarding providing insurance services to clients and presented evidence from plaintiff's former clients who testified that plaintiff did discuss insurance issues with them. While plaintiff

Page 26

disputes the reasons for his termination, he does not demonstrate that defendants did not honestly believe that plaintiff violated Bank policy and thus should be terminated.  See Damon, 196 F.3d at 1363 n.3 ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."); see also Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002) ("We are not interested in whether the conclusion is a correct one, but whether it is an honest one.").   Accordingly, and for all the aforementioned reasons, the court GRANTS defendants' motion for summary judgment on plaintiff's claim for age discrimination.   The court further exercises its discretion and will not entertain plaintiff's state law claims and they are hereby DISMISSED WITHOUT PREJUDICE.   The foregoing constitutes the memorandum of opinion referenced in this court's June 1, 2007 order.

### Summary

1) Defendants Bank of America Corporation, Banc of America Investment Services, Inc., and Bank of America, National Association's motion for summary judgment [docket no. 133] is **GRANTED IN PART** with regard to plaintiff's federal law claim for age discrimination.   Plaintiff's remaining state law claims are **DISMISSED WITHOUT PREJUDICE**.   The foregoing constitutes the

memorandum of opinion referenced in this court's June 1, 2007 order.

2) Defendants' motion to seal transcript of Mark E. James [docket no. 40] is **GRANTED AS UNOPPOSED**.


**SO ORDERED**, this ____6____ day of June, 2007.


_____
G. ERNEST TIDWELL, JUDGE
UNITED STATES DISTRICT JUDGE